CONTRACT BUILDERS SERVICE CORPORATION, Plaintiff-Appellee, *v.* TERRY P. ELAND, *et al.*, Defendants.—(TERRY P. ELAND, Defendant-Appellant and Cross-Appellee; EDWARD HINES LUMBER CO., Intervening Plaintiff-Appellee and Cross-Appellant; FRANK J. LAURENZANA, Plaintiff; SUSAN ELAND, Intervening Petitioner-Appellant.)

Second District   No. 80-425

Opinion filed November 3, 1981.—Rehearing denied December 8, 1981.

Michael Nigro, of Nigro and Westfall, of Glendale Heights, for appellants Terry P. Eland and Susan Eland.

Edward Daugherty and T. B. Newitt, both of Brodl, Daugherty and Addison, of Chicago, for appellee Edward Hines Lumber Co.

John Demling, of Glen Ellyn, for appellee Contract Builders Service Corporation.

Mr. JUSTICE VAN DEUSEN delivered the opinion of the court:

This is an appeal from an order of the circuit court of Du Page County wherein Contract Builders Service Corporation (Contract Builders) and Edward Hines Lumber Company (Hines) were granted a decree to foreclose mechanics' liens claimed against premises owned by Susan and Terry P. Eland. In the same action, the court denied a mechanics' lien claim filed by Frank J. Laurenzana. Susan Eland, who intervened in the action only after the mechanics' liens had been granted, and Terry Eland appeal from the decree of foreclosure. Hines has cross-appealed, asserting that they were entitled to a lien in the sum of $10,994, therefore, the $5,972 lien granted to them was in error.

In the fall of 1976, Terry P. Eland, an attorney, retained Contract Builders to furnish the cement, steel and carpentry work for the residence Eland planned on building. In February of 1977, after some negotiations, the parties entered into a contract with a price of $23,500. Contract Builders started the carpentry work on or about February 28, 1977, and continued on the job for one month. A disagreement concerning the progress of the work arose between the parties, and the contract was terminated by Eland in late March or early April. Contract Builders' last day on the site was Friday, April 1, 1977. All parties appear to agree that when Contract Builders left the site, the contracted work was approximately one-half completed. On April 29, 1977, Contract Builders filed a claim for a mechanics' lien on the premises.

After Contract Builders left the site, Eland hired Frank J. Laurenzana to complete the construction. The house was substantially completed in August of 1977. On August 28, 1977, Eland moved into the residence and on September 25, 1977, Eland married Susan P. Eland. In early September, Laurenzana gave to Eland a bill for materials and labor and what purported to be a signed, final lien waiver from Laurenzana's material supplier, Hines. Eland then made a series of payments to Laurenzana.

In October of 1977, Hines, a material supplier of Laurenzana, filed a claim for a mechanics' lien in the amount of $10,075.45 against the Eland residence. In December of 1977, Hines filed a final claim for a mechanics' lien against Eland and Laurenzana. At that time, the lien claimed against Eland amounted to $10,994. On February 14, 1978, Terry Eland quit-claimed an interest in the house to his wife, Susan. At that time he instructed her not to record the quitclaim deed due to pending litigation.

In May of 1978, Laurenzana filed his claim for an $11,742.62 lien against the Eland premises.

On December 9, 1978, Contract Builders filed suit to foreclose its mechanics' lien. Eland answered and counterclaimed, alleging that Contract Builders had breached the contract. Hines Lumber Company intervened and also filed its claim to foreclose its mechanics' liens. In the same action, Hines brought suit against Laurenzana, claiming an amount due under a contract. Laurenzana filed a counterclaim to foreclose his lien on the Eland premises.

On October 30, 1979, after a trial on the various issues, the court granted a $5,609 lien plus costs and interest in favor of Contract Builders and a lien for $5,972 plus interest and costs to Hines. Hines was also granted a judgment against Laurenzana. Laurenzana's lien claim against the Eland premises was denied.

On November 19, 1979, Eland filed a motion to reconsider. On November 27, 1979, Eland filed additional objections to the decree. At that time, he asserted that the decree of foreclosure was defective in that the parties had failed to join his wife, Susan Eland. On December 13, 1979, after filing a petition to intervene, Susan Eland was granted leave to present a written offer of proof as to what interest she asserted in the premises.

In its January 28, 1980, letter to the parties, the trial court stated that the offer of proof established that Susan Eland married Terry P. Eland on September 5, 1977, after the house had been built, and after all rights pertaining thereto had ripened and attached. The court also found that on February 28, 1978, the defendant, Terry Eland, had executed and delivered a quitclaim deed to Susan Eland with the directions that it not be recorded because of pending litigation. Under the precise facts of this case, the trial court concluded that Susan Eland was not a necessary party; therefore, the motion to dismiss for failure to join her as a necessary party was denied. On February 1, 1980, after considering the various post-trial pleadings, the court entered a decree of foreclosure.

On appeal, the first issue raised by the Elands is that Susan Eland is a necessary party for the entry of decree of foreclosure and that the failure of the claimants to join her makes the decree void. The Elands also contend that the failure to join Susan Eland denied her due process of law. In view of the circumstances in this case, these contentions are without merit.

The Elands contend that Susan Eland, by virtue of her marital relationship with Terry Eland, is a necessary party. The Elands rely principally on the case of *Leffers v. Hayes* (1945), 327 Ill. App. 440, to support their position. We recognize that in both *Anderson v. Gousset* (1965), 60 Ill. App. 2d 309, and *Leffers v. Hayes*, the court held that even if the wife

of a property owner was not a record owner of the property, she still is a necessary party for a suit to foreclose a mechanics' lien. *Anderson v. Gousset*, as well as *Leffers v. Hayes*, can be distinguished from this case. In those cases, there is no contention that the property owner had not been married during the time that the improvements were made, nor is there any contention that the lien claimants were unaware of the marital status of the property owner. In this case, it is evident that none of the plaintiffs had any knowledge of the September 5, 1978, marriage of Terry P. Eland. Eland's contention that when the plaintiffs visited the Eland home to take slides to be introduced into evidence they should have appreciated the significance of Mrs. Eland's presence on the premises and joined her as a party is totally without merit.

Because the plaintiffs had no knowledge of Terry Eland's marriage, they could not have known of any interest Susan Eland may have had in the premises by virtue of marriage. Section 11 of the Mechanics' Lien Act provides that in a mechanics' lien foreclosure action the plaintiff must join "all parties interested, of whose interest he is notified or has knowledge." (Ill. Rev. Stat. 1977, ch. 82, par. 11.) Because the plaintiffs had no knowledge of Eland's marriage, we need not discuss what interest, if any, was created by virtue of the marriage.

Defendant's contention that Susan Eland's interest as a tenant made her a necessary party is also without merit. Obviously, at the time of the decree she was not a tenant; she was an unrecorded owner of the property. There is no doubt, however, that Susan Eland has an interest in the premises by virtue of the unrecorded quitclaim deed. Section 11 defines the necessary parties in interest to include "all persons who may have any valid claim to the whole or any part of the premises upon which a lien may be attempted to be enforced under the provisions thereof, or who are interested in the subject matter of the suit." (Ill. Rev. Stat. 1977, ch. 82, par. 11.) We note that the quitclaim deed was not recorded, and that the record on appeal is devoid of any evidence that the plaintiffs knew of this conveyance of an interest in the premises. As stated earlier, under section 11 plaintiffs are required to join only those parties of whose interest they have knowledge.

■■ Moreover, her interest was conveyed to her subsequent to the filing of the notice of a claim for a lien by both Contract Builders and Hines. Because Susan Eland acquired her interest after the claims had been filed, she had constructive notice of the lien claim. Additionally, in her own affidavit she admits knowledge of the pending litigation. Therefore, she acquired the property subject to the lien claims.

■■ The Elands' contention that the failure to join Susan Eland deprives her of an opportunity to defend and thereby deprives her of a right to due process of law is without merit. Under the circumstances in this case,

Susan Eland was not denied any of her due process rights. She was well aware of the pending litigation and under section 11 of the Mechanics' Lien Act any interested person "may, on application to the court wherein the suit is pending, be made or become parties at any time before final judgment." (Ill. Rev. Stat. 1979, ch. 82, par. 11.) Both she and Terry P. Eland deliberately delayed raising the issue of her interest in the property until after the trial and after the court had rendered an unfavorable decision. The trial judge properly denied the petition of Susan Eland to intervene in the cause after the decree was entered, and properly denied the motion to dismiss.

The Elands also contend that the trial court's finding that Eland, without justification, terminated his contract with Contract Builders is against the manifest weight of the evidence. We disagree. While Eland admits that he terminated the contract between himself and Contract Builders, he contends that at the time the contract was terminated Contract Builders was in breach of the contract. Therefore, the termination of the contract by Eland was justified. Eland concludes that because the termination was justified, Contract Builders is not entitled to a lien.

Eland asserts that Contract Builders breached their contract in that (1) they failed to work continuously at the site and (2) they failed to order the windows and siding for the home.

According to the testimony at trial, one of the conditions of the contract was that Contract Builders would continuously work on the Eland home. Contract Builders was not required, however, to work on the weekends or during inclement weather. The architect, Jeffrey Farrell, testified that in late March he visited the site and noted that, despite the clear weather, Contract Builders was not on the site. At trial, George Gross, president of Contract Builders, admitted that they missed working at the site on several days in March, including the day Farrell visited the site. He further testified that they missed working on those days because of inclement weather.

Eland contends that on five days in March, Contract Builders did not show up even though the weather was permitting. Those days were: March 3, 4, 7, 18 and 29. He argues that the certified weather reports for O'Hare and Du Page County Airports indicate that on those days the weather was amenable to outdoor work. We note, however, that these weather reports, which were admitted into evidence, do not totally support Eland's contentions. These reports indicate that on both March 3 and 4 there was intermittent rain, drizzle and fog all day. Although the total precipitation was low, it is obvious that the weather was not suited for outdoor work. Similarly, the weather on the 18th was not suitable for outdoor work. Rain started to fall in the early evening hours of the 17th.

Precipitation continued until 8 a.m. on the 18th. In the early hours of the 18th the rain turned to snow. Temperatures remained in the mid-thirties.

On only two of those days, the 7th and 29th, was the weather somewhat suitable for outdoor work. The reports indicated that on the 29th there was only a trace of rain and that temperatures were in the high 50's. The reports also show, that there was continuous rain, fog, drizzle and an occasional thunderstorm from 8:50 a.m. March 27 until the early hours of the 29th. It is a fair assumption that on the 29th the ground conditions were, as Gross stated on his time sheet, "miserable" and unsuitable for carpentry work.

The weather reports, however, do indicate that the weather was clear on the 7th of March. On that day, Contract Builders did work a half a day. Thus, it appears that Contract Builders missed working on only one-half of a good weather day. The evidence also indicates that Contract Builders worked on at least one Saturday, even though it was not required to do so. We also note that Eland's architect and friend, Jeffrey Farrell, testified that the carpentry work was proceeding at a normal pace. Under these facts, Eland was not justified in terminating the contract.

Eland also contends that Contract Builders breached the contract by not timely ordering the windows and siding. No evidence was introduced at trial to indicate that the contract contained any terms regarding when the windows and siding should be ordered or even when the carpentry work was to be completed.

Farrell testified, however, that generally the windows are ordered at the time the carpentry work begins. This is done so that the windows will be on hand when they are needed. Eland contends that because Contract Builders had been on the site a month and had not yet ordered the windows, timely performance of the contract was impossible.

Gross, on the other hand, testified that his "game-plan" was not to order the windows until he had finished the framing for the windows. He stated that the windows to be used in the Eland home were not the type usually installed in a home. Although quite a few windows were to be installed, only three of them were operable. He also testified that due to the need for extensive grading and cement work on the exterior, lower levels of the structure, these windows had to be tight in their frames or else problems would develop. He also testified that he obtained price quotes on the glass and that if he ordered the windows, he could definitely have them delivered in one or two weeks. There is sufficient evidence to infer that Gross' failure to order the windows did not amount to a breach of the contract.

Finally, Eland contends that he was justified in terminating the contract because Gross planned to "walk-off" the job and work full-time on

another job. Eland contends that Gross failed to introduce any evidence to rebut Eland's testimony that Gross was going to "walk-off" the job. Although Gross did not directly refute this testimony of Eland, Gross' testimony, when read as a whole, indicates that he intended to continue working on the Eland home, and that he "packed-up his tools" only after receiving oral and written orders to leave the site.

■■ Overall, the testimony of Gross and Eland is contradictory, and when the evidence is contradictory, a judgment will not be overturned merely because the court could have reached a different conclusion. (*Wm. Aupperle & Sons, Inc. v. American National Bank & Trust Co.* (1975), 28 Ill. App. 3d 573, 579.) Because the trial court's determination that Eland unjustifiably terminated the contract is supported by the evidence, it will not be overturned by this court.

Section 4 of the Mechanics' Lien Act (Ill. Rev. Stat. 1977, ch. 82, par. 4) provides that a contractor who is prevented from performing his contract by default of the owner shall be entitled to enforce his lien for the value of what has been done. (*Miller v. Reed* (1973), 13 Ill. App. 3d 1074, 1077.) In this case, because the trial court found that Eland had terminated the contract without just cause, Contract Builders is entitled to a mechanics' lien for the value of the work performed. The trial court's finding that the work done by Contract Builders was worth $5,609 was amply supported by the evidence and is, therefore, affirmed.

Eland next contends that because Hines gave Laurenzana an executed final lien waiver, Hines is barred from claiming a mechanics' lien on the Eland premises.

It is undisputed that on September 2, 1977, Hines issued a final lien waiver on the Eland premises. This waiver recited that Hines had received $6,990.40 as final payment on materials supplied to Laurenzana for use on the Eland home, and that for this consideration Hines agreed to waive all liens on the Eland premises. The waiver was signed and notarized. Furthermore, there was no indication on the face of the waiver that Laurenzana had not yet paid for the waiver, nor did Hines give Eland any other notice that Laurenzana had not yet paid for the waiver. Eland retained the waiver of the lien for approximately 20 days. During that 20-day period he paid approximately $9,500 to Laurenzana. At the end of the 20 days, Eland gave the waiver back to Laurenzana, who returned it to Hines. Hines voided the waiver.

In *Edward Hines Lumber Co. v. Dell Corp.* (1977), 49 Ill. App. 3d 873, the court discussed Hines' practice of issuing unpaid lien waivers. In that case, the court held that in light of the industry custom of issuing lien waivers before payment, and in light of the defendant's knowledge and use of the aforesaid custom, Hines could repudiate its lien waiver. (See also *Chicago Bridge & Iron Co. v. Reliance Insurance Co.* (1970), 46 Ill.

2d 522.) Neither *Hines* nor *Chicago Bridge & Iron Co.* addresses the problem of an owner who is unaware of the custom, and who, in reliance on the lien waiver, paid out funds.

If Eland believed that the waiver was what it purported to be, and he relied on that waiver when he paid out the $9,500, it is clear that he was deceived and prejudiced by Hines' practice of issuing lien waivers before payment is received. Here, Eland testified that Laurenzana told him that Hines had confused the Eland invoices and orders with those from other carpentry projects and that Laurenzana had, therefore, agreed to pay the Hines bill out of his own account. When Laurenzana gave the final waiver to Eland, Laurenzana stated that the waiver was proof of payment. Eland testified that after he paid Laurenzana, he returned the waiver to Laurenzana, as he had done earlier with all other lien waivers, and instructed Laurenzana to deliver it to Eland's mortgagee. Laurenzana, on the other hand, testified that he told Eland that the waiver was unpaid. Other than this testimony by Laurenzana, there is no other evidence that Eland knew the final waiver was unpaid. Because the trial court expressly stated that Laurenzana's testimony would not be accepted as proof of any fact, Hines failed to introduce any credible evidence to refute Eland's testimony. Additionally, there is no evidence that Eland was aware of Hines' practice of issuing lien waivers before payment.

■■ The manifest weight of the credible evidence establishes that Eland innocently relied on the representations set out on the lien waiver. An innocent party has a right to rely on a signed lien waiver. *Richard's Lumber & Supply Co. v. National Bank of Joliet* (1975), 32 Ill. App. 3d 835.

■■ Under the circumstances in this case, Hines will not be permitted to come to court and attack its own, freely-issued document. As against a party unaware of Hines' practice, Hines will not be able to assert that a document which in essence, said "for value received we hereby waive" should have been construed to have read "for value, which we may or may not have received, we waive or do not waive, as the case may be, our lien rights." That part of the judgment granting Hines a mechanics' lien of $5,972.72 is hereby reversed.

Affirmed in part; reversed in part.

HOPF and UNVERZAGT, JJ., concur.